**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

OC GLOBAL PARTNERS, LLC,

       *Plaintiff*,

  -against-

LIRDES S.A. AND LUIS FELIPE ADAIME,

      *Defendants*.

Case No.  21-CV-10686

**JURY TRIAL DEMANDED**

---

## COMPLAINT

Plaintiff OC Global Partners, LLC ("OC Global") states the following for its Complaint against Defendants LIRDES S.A. d.b.a Moss.Earth ("MOSS") and Luis Felipe Adaime ("Mr. Adaime," and collectively with MOSS, "Defendants").

## INTRODUCTION

1.    This action arises from Defendants' failure to compensate OC Global for its services, which included securing the listing of Defendants' environmental cryptocurrency on one of the world's premier cryptocurrency exchanges. Defendants have achieved enormous value from that listing but refuse to pay OC Global the compensation it is due. Defendants' actions stand in blatant violation of a binding contract as well as Defendants' common law and statutory obligations. Defendants' conduct has also caused great harm to the relationship between Plaintiff and some of the world's most influential investors and a leading cryptocurrency exchange.

2.    The cryptocurrency involved in this case is an environmental asset created by MOSS known as an "MCO2 Token." An MCO2 Token represents a claim on a certified carbon

credit held in an aggregated pool of carbon credits. MCO2 Tokens are fungible and do not represent a claim on a specific underlying carbon credit.

3.    A carbon credit is a type of permit that represents one ton of carbon dioxide removed from the atmosphere. Carbon credits have attracted recent interest because they represent a potential solution to stem the mounting tide of carbon emissions. Individuals and companies can purchase carbon credits to offset emissions, and if enough offsets are purchased, it can result in certain carbon-emitting activities becoming carbon neutral.

4.    In the fall of 2020, MOSS engaged OC Global, through its co-founder and Managing Partner Shahryar Oveissi ("Mr. Oveissi"), to introduce the global marketplace to MOSS and its environmental assets, including MCO2 Tokens.

5.    The purpose of OC Global's involvement with MOSS was to utilize Mr. Oveissi's extensive connections and experience to advance MOSS's mission to combat climate change and preserve the Amazon rainforest by facilitating brand awareness of MOSS and the sale of its MCO2 Tokens. Not incidentally, MOSS stood to make a great deal of money in the process, as listing on a globally recognized cryptocurrency exchange can be very lucrative.

6.    In a signed contract dated February 10, 2021 (the "Contract"), MOSS agreed to pay OC Global for Mr. Oveissi's work. Specifically, MOSS agreed to pay "the amount corresponding to 25% of the total value resulting from the sales of its environmental assets, [including] carbon credits or MCO2 Tokens, to the buyers identified and presented by [OC Global]" (the "OC Global Fee").

7.    In furtherance of OC Global's efforts to help MOSS build its brand and sell its MCO2 Tokens, Mr. Oveissi introduced MOSS and its founder, Mr. Adaime, to the founders and senior management of Gemini Trust Company, LLC ("Gemini"), who are among the most

2

influential people in the cryptocurrency market. Gemini operates a cryptocurrency exchange, the Gemini Exchange (the "Exchange"), which allows users to buy, sell, trade and securely store bitcoin, ethereum and about 40 other cryptocurrencies. On information and belief, the Exchange has at least 56 million active users from one hundred countries and is recognized worldwide as one of the preeminent cryptocurrency exchanges.

8.     Mr. Oveissi repeatedly promoted MOSS and its MCO2 Tokens to the decisionmakers at Gemini, and as a direct result of Mr. Oveissi's efforts, MOSS was able to pitch MOSS's business and the MCO2 Tokens to Gemini on at least two occasions.

9.     Those pitches were successful. On September 17, 2021, MOSS announced the listing of the MCO2 Tokens on the Exchange (the "Listing"), representing a powerful milestone in MOSS's history and creating enormous value in the company

10.     MOSS, however, has refused to pay OC Global the OC Global Fee as mutually agreed.

11.     Accordingly, OC Global brings this action to recover the compensation and value it is due and to rectify the reputational damage caused by Mr. Adaime and his deception.

## THE PARTIES

12.     OC Global Partners, LLC is a Delaware limited liability company with its principal place of business in Stamford, Connecticut.

13.     Upon information and belief, LIRDES S.A. d.b.a Moss.Earth is a joint stock company with locations in Sao Paulo, Brazil and Montevideo, Uruguay.

14.     Upon information and belief, Luis Felipe Adaime is a Brazilian national who resides in Porto Alegre, Brazil and Punta del Leste, Uruguay. Upon information and belief, Mr. Adaime is the founder, CEO and an active partner of MOSS, as well as its legal representative.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction based on diversity of citizenship under 28 U.S.C. § 1332(a)(2). The amount in controversy exceeds $75,000.

16.     This Court has personal jurisdiction over MOSS because MOSS lists its MCO2 Tokens on the Exchange and Gemini is a New York trust company regulated by the New York State Department of Financial Services and is headquartered in New York, New York. MOSS offers its products for sale and solicits customers in New York and, more generally, the United States.

17.     This Court has personal jurisdiction over Mr. Adaime because Mr. Adaime transacts substantial business in New York through MOSS, which lists its MCO2 Tokens on the Exchange and offers its products for sale and solicits customers in New York and, more generally, the United States.

18.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2) and 1391(c)(3).

## FACTUAL BACKGROUND

I.     *OC Global's Introduction of MOSS to Gemini.*

19.     In July 2020, Mr. Adaime on behalf of MOSS, sought Mr. Oveissi's help in supporting MOSS's brand and finding buyers for MOSS's MCO2 Tokens. OC Global, through Mr. Oveissi, has earned a reputation across the globe as a connector through its success helping companies expand into new international markets. Mr. Oveissi maintains an extensive network of contacts and relationships in the Middle East, Europe and United States. From the start, Mr. Adaime expressed interest in utilizing OC Global's connections with Gemini to benefit MOSS.

20.     Mr. Oveissi actively pursued a number of potential avenues for supporting MOSS and its sales of MCO2 Tokens. Among other initiatives, Mr. Oveissi introduced MOSS to (i)

Guillaume Le Cunff, the Chief Executive Officer of Nestle Nespresso S.A.; (ii) Jerome Perez, Global Head of Sustainability of Nestle Nespresso S.A.; (iii) Conor C. Flynn, the Chief Executive Officer of Kimco Realty Corporation, a real estate investment trust that is North America's largest publicly traded owner and operator of open-air, grocery anchored shopping centers and mixed-use assets; (iv) Terry Tamminen, former Secretary of the California Environmental Protection Agency and Chief Policy Advisor to the Governor of California; and (v) former senior executives of BlackRock, Inc., an American multinational investment management corporation based in New York City and the world's largest asset manager, with approximately $9.5 trillion in assets under management as of October 2021.

21.     One of the many avenues Mr. Oveissi pursued for the benefit of MOSS was an opportunity with Gemini. Mr. Oveissi has been close friends with the founders of Gemini, Tyler Winklevoss and Cameron Winklevoss (the "Winklevosses"), for nearly 40 years.

22.     The Winklevosses stand at the forefront of the cryptocurrency movement as two of the first bitcoin billionaires. Their Exchange, founded in 2015, is one of the largest marketplaces for cryptocurrency in the world.

23.     Indeed, Mr. Oveissi's relationship with the Winklevosses was one of the reasons Mr. Adaime sought OC Global's help in promoting MOSS and its MCO2 Tokens. Mr. Adaime was very excited about the publicity MOSS would receive as a result of a partnership with Gemini and/or the Listing.

24.     In early November 2020, Mr. Oveissi reached out to the Winklevosses and introduced them to MOSS, Mr. Adaime and the MCO2 Tokens.

25.     In response, Tyler Winklevoss introduced Mr. Oveissi to Marshall Beard, Head of Strategy & Corporate Development at Gemini ("Mr. Beard").

26.     On November 10, 2020, Mr. Oveissi provided an email introduction between Mr. Adaime and Mr. Beard.

27.     That same day, Mr. Adaime emailed Mr. Beard. He provided a pitch deck for the MCO2 Token and expressed his interest in discussing business with Gemini.

28.     On or about November 18, 2020, members of the MOSS team, including Mr. Adaime, spoke with Mr. Beard to promote MOSS and the MCO2 Token. Over the next several months, Mr. Adaime, Mr. Oveissi and Mr. Beard continued to correspond about the possibilities for business between MOSS and Gemini.

*II.     OC Global and MOSS Enter into the Contract.*

29.     As OC Global continued its efforts to promote the MCO2 Tokens to Gemini and other potential partners, OC Global and MOSS negotiated the terms of OC Global's compensation.

30.     After some back and forth, Mr. Oveissi and Mr. Adaime agreed that MOSS would pay OC Global the 25% OC Global Fee. In an email dated January 28, 2021, Mr. Adaime explicitly agreed that the 25% fee due to OC Global would extend to the eventual listing on the Exchange.

31.     Mr. Adaime directed members of his MOSS team to draft an agreement that reflected the application of the OC Global Fee to "any token/carbon credit sales for MOSS" and "Same for eventual listing at Gemini." Upon information and belief, Mr. Adaime copied MOSS's outside counsel and internal legal representative on these communications, leaving no room for doubt that the Listing was to constitute performance under the Contract.

32.     Mr. Adaime (on behalf of MOSS) and Mr. Oveissi (on behalf of OC Global) executed the Contract on February 10, 2021. A copy of the Contract is attached as **Exhibit A**.

33.     Pursuant to Section 3 of the Contract, MOSS agreed to pay OC Global "the amount corresponding to 25% of the total value resulting from the sales of its environmental assets (carbon credits or [MCO2 Tokens]) to the buyers identified and presented by [OC Global]."

34.     Pursuant to Section 3 of the Contract, MOSS's obligation to compensate OC Global survives termination of the Contract. Section 3 provides, "[OC Global] will continue to receive remuneration for as long as the buyer continues to transact with MOSS."

III.     OC Global Satisfied Its Duties under the Contract.

35.     Over the next many months, Mr. Oveissi continued to communicate with the Winklevosses about MOSS and build connections with various high-level Gemini employees.

36.     As a result, MOSS and the MCO2 Tokens gained more and more traction within the Gemini organization. For example, Tyler Winklevoss introduced Mr. Oveissi to Jamie Chapman, Project Manager for Gemini and Beth Kurteson, Managing Director of Gemini, who together, run Gemini Green, a program to reduce atmospheric emissions. In his introduction, Tyler refers Mr. Oveissi as "a family friend who…brought the MOSS token to our attention."

37.     On March 30, 2021, as a result of the initial introduction facilitated by OC Global, MOSS was given the opportunity to pitch the MCO2 Tokens to C-Suite executives of Gemini.

38.     During the meeting, MOSS proposed the Listing as a key element of MOSS's engagement with Gemini.

39.     On the day following MOSS's meeting with Gemini's executive team, Mr. Oveissi again followed up with the Winklevosses to draw their attention to MOSS and update them on MOSS's communications with Gemini. Tyler Winklevoss acknowledged Mr. Oveissi's reminder, and expressed personal interest in reviewing MOSS's marketing materials.

40.     MOSS succeeded in accomplishing its goal. On September 17, 2021, MOSS announced the Listing after months of effort by OC Global to promote MOSS and the MCO2 Tokens to Gemini.

41.     The Listing is the critical driver of the substantial increase in the enterprise value of MOSS.

42.     Upon information and belief, news of the anticipated Listing catapulted the price of MCO2 Tokens by nearly 116% in just three days between September 13, 2021 and September 16, 2021.

43.     The Listing provided credibility MOSS never would have attained without the efforts of OC Global.

44.     In September 2021, there was trading volume of over 682,000 MCO2 Tokens (USD value of over $6.8 million) on the Exchange.

45.     In October 2021, trading volume increased by nearly 100%, representing over 1.2 million MCO2 Tokens (USD value of over $15 million).

46.     In November 2021, trading volume again more than doubled, increasing to more than 2.6 million MCO2 Tokens (USD value of approximately $30 million).

47.     Successfully listing the MCO2 Tokens on the Exchange brought hundreds of thousands of buyers to the MCO2 Tokens in only three months. There is no reason this growth will not continue in the coming months and years, and OC Global will continue to accrue compensation as MOSS continues to benefit.

                    IV.     *GSR Did Not Facilitate MOSS's Introduction to Gemini.*

48.     Notwithstanding OC Global's instrumental role in securing the Listing, MOSS has refused to compensate OC Global for services rendered. In an attempt to justify its unlawful

actions, MOSS has claimed that the Listing was the product of an introduction made by GSR Markets Limited ("GSR"), a company that provides trading services to cryptocurrency token buyers.

49.     Pursuant to Section 4 of the Contract, the OC Global Fee would not be due if MOSS had a prior relationship with a client. In such event, MOSS was obliged to provide written notice of the conflict to Mr. Oveissi, "**otherwise it will be assumed there was no conflict prior to introduction by [OC Global]**." As no notice was provided, pursuant to the Contract it is assumed that OC Global's introduction of MOSS to Gemini was the first contact between the parties and the OC Global Fee applies.

50.     At no point did Mr. Adaime or MOSS propose to renegotiate the Contract or notify OC Global that its efforts would be nullified based on GSR's participation. The fact that GSR may have also played a role in facilitating the Listing does not in any way diminish OC Global's introductions and efforts, nor negate MOSS's obligations to OC Global.

51.     As previously described, OC Global's introductions made it possible for MOSS to build relationships with decisionmakers at Gemini and ultimately secure the Listing. Tyler Winklevoss has acknowledged that Mr. Oveissi played an essential role in Gemini's ultimate decision to list the MCO2 Tokens on the Exchange. Even Mr. Adaime recognized OC Global's role in connecting MOSS with Gemini. In a discussion regarding Gemini, Mr. Oveissi stated to Mr. Adaime, "[just] [don't] forget who's going to make this happen," to which Mr. Adaime responded, "NEVER."

52.     MOSS's refusal to recognize OC Global's role in connecting it to Gemini and achieving the Listing has caused damage to OC Global's reputation as an elite connector. OC Global, through Mr. Oveissi, is globally recognized as an entity which, through its extensive

relationships in the financial and investment industries, can help take companies to new heights. When MOSS refused to compensate OC Global for its services, this dispute became public, damaging OC Global's reputation.

### FIRST CAUSE OF ACTION
Breach of Contract
(Against MOSS)

53.     OC Global re-alleges and incorporates paragraphs 1-52 as if fully set forth herein.

54.     OC Global and MOSS entered into a valid, binding and enforceable contract on February 10, 2021.

55.     OC Global has performed its obligations under the Contract.

56.     Despite OC Global's performance in full, MOSS has breached the contract by refusing to pay the agreed-upon OC Global Fee due and owing to OC Global under the Contract, 25% of the total value resulting from OC Global's services, including the Listing and sales of MCO2 Tokens.

57.     In November 2021, more than 2.6 million MCO2 Tokens were traded on the Exchange at an approximate price of $11.50 per MCO2 Token, totaling an estimated $30 million.

58.     As a direct and proximate result of MOSS's breach of contract, OC Global has suffered substantial damages in an amount to be determined at trial but in any event not less than $7,500,000.

### SECOND CAUSE OF ACTION
Breach of the Implied Covenant of Good Faith and Fair Dealing
(Against MOSS)

59.     OC Global re-alleges and incorporates paragraphs 1-52 as if fully set forth herein.

60.    OC Global and MOSS entered into a valid, binding and enforceable contract on February 10, 2021.

61.    The Contract contained an implied covenant of good faith and fair dealing.

62.    OC Global expected to receive the OC Global Fee within a reasonable time after the MCO2 Tokens were listed on the Exchange.

63.    Instead, MOSS willfully deprived OC Global of its expectations under the Contract and, in doing so, MOSS breached its obligation of good faith and fair dealing under the Contract.

64.    Rather than remitting to OC Global the OC Global Fee it is owed, MOSS has taken the position that GSR introduced MOSS to Gemini, and that OC Global is entitled to nothing.

65.    GSR introduced a low-level manager to Gemini after months of effort and investment of resources by OC Global had ensured the MCO2 Tokens would be listed on the Exchange.

66.    MOSS has acted in bad faith and deprived OC Global of the benefit of the Contract.

67.    These aforementioned acts by MOSS, as well as other acts to be discovered, constitute a breach of the implied covenant of good faith and fair dealing in connection with the Contract.

68.    As a direct and proximate result of the above-mentioned breaches, OC Global has been and continues to be damaged.

69.     OC Global demands judgment against MOSS in an amount equal to at least $7,500,000, plus interest and costs, the exact amount to be determined at trial, in association with MOSS's unreasonable failure to pay the OC Global Fee to which OC Global is entitled.

### THIRD CAUSE OF ACTION
Fraud
(Against Mr. Adaime)

70.     OC Global re-alleges and incorporates paragraphs 1-52 as if fully set forth herein.

71.     Mr. Adaime knowingly and intentionally falsely represented that MOSS would pay to OC Global the OC Global Fee upon the successful Listing despite knowingly intending to prevent MOSS from doing so.

72.     Mr. Adaime knowingly and intentionally falsely represented that the Listing would constitute performance under the Contract despite knowingly intending not to acknowledge OC Global's entitlement to the OC Global Fee upon the Listing.

73.     Mr. Adaime induced OC Global to enter into the Contract and induced Mr. Oveissi to expend considerable time and reputational capital promoting MOSS and the MCO2 Token based on these material and intentionally false misrepresentations.

74.     OC Global was not aware that Mr. Adaime intended to prevent MOSS from remitting payment of the OC Global Fee upon the successful Listing.

75.     Absent Mr. Adaime's material and intentionally false representations, OC Global would not have expended significant resources cultivating the relationship between MOSS and Gemini to achieve the Listing.

76.     OC Global relied on Mr. Adaime's material and intentionally false representations when fully performing its obligations under the Contract, and incurred

significant harm and damages as a result of identifying and introducing Gemini to MOSS. The harm and damages include reputational harm to OC Global and the expenditure of time, energy and resources that could have otherwise been allocated to other projects.

77.     Mr. Adaime's fraudulent conduct has materially harmed OC Global's business, and, as a result of Mr. Adaime's breaches and wrongful conduct, OC Global's business is damaged and is now left with a business that is less valuable than prior to entering into the Contract.

78.     Mr. Adaime's fraudulent conduct has materially harmed OC Global, and, as a result of Mr. Adaime's breaches and wrongful conduct, OC Global has experienced reputational harm among significant business partners and loss of business opportunities.

79.     OC Global seek compensatory damages in an amount to be determined at trial.

80.     OC Global respectfully requests that, due to Mr. Adaime's deceptive, intentional, wanton and malicious acts, punitive damages in an amount to be determined at trial be awarded to OC Global.

## FOURTH CAUSE OF ACTION
Negligent Misrepresentation
(Against Mr. Adaime)

81.     Plaintiff re-alleges and incorporates paragraphs 1-52 as if fully set forth herein.

82.     Mr. Adaime falsely and negligently represented that MOSS would pay the OC Global Fee to OC Global upon the MCO2 Tokens listing on the Exchange despite intending to prevent MOSS from doing so.

83.     Mr. Adaime falsely and negligently represented that the Listing would constitute performance under the Contract despite intending not to acknowledge OC Global's entitlement to the OC Global Fee upon the Listing.

84.     Mr. Adaime failed to exercise due competence and care in making false representations to OC Global and Mr. Oveissi because Mr. Adaime knew OC Global and Mr. Oveissi would rely on representations made by Mr. Adaime when entering into the Contract and expending efforts and resources to achieve the Listing.

85.     Mr. Adaime chose to make representations to OC Global and Mr. Oveissi to induce their work to promote the MCO2 Tokens, including, without limitation, making introductions to Gemini executives to facilitate the Listing. As such, Mr. Adaime owed a duty to OC Global to speak accurately and truthfully.

86.     Mr. Adaime induced OC Global to enter into the Contract and expend considerable time and reputational capital promoting MOSS and the MCO2 Token based on these material and negligent misrepresentations.

87.     Absent Mr. Adaime's material and negligent misrepresentations, OC Global would not have expended significant resources cultivating the relationship between MOSS and Gemini.

88.     OC Global relied on Mr. Adaime's negligent misrepresentations when fully performing its obligations under the Contract, and incurred significant harm and damages as a result from identifying and introducing Gemini to MOSS. This includes reputational harm and the expenditure of time, energy and resources that could have otherwise been allocated to other projects.

89.     Mr. Adaime's negligent conduct has materially harmed OC Global's business, and, as a result of Mr. Adaime's breaches and wrongful conduct, OC Global's business is damaged and is now left with a business that is less valuable than prior to entering into the Contract.

90.     Mr. Adaime's fraudulent conduct has materially harmed OC Global, and, as a result of Mr. Adaime's breaches and wrongful conduct, OC Global has experienced reputational harm with significant business partners and loss of business opportunities.

91.     OC Global seeks damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### Violations of the Connecticut Unfair Trade Practices Act ("CUTPA")
### (Against all Defendants)

92.     OC Global re-alleges and incorporates paragraphs 1-52 as if fully set forth herein.

93.     Defendants' actions, including withholding payment to OC Global in bad faith; refusing to perform their obligations under the Contract while retaining the benefits of services rendered by OC Global; misrepresenting the fact that the OC Global Fee would apply for the benefit of OC Global in the case of a successful Listing; and facilitating the actions detailed above, are unfair and oppressive and violate the public policy against unfair and deceptive business practices.

94.     Defendants' aforementioned conduct was undertaken in the course of their trade or business with OC Global, a Connecticut-based business. Defendants' conduct occurred, in large part, through negotiations and interactions in Connecticut with OC Global.

95.     Defendants' aforementioned conduct therefore constitutes unfair or deceptive practices within the meaning of Connecticut General Statute § 42-110(b), in that said conduct violates or offends public policy, is immoral, unethical or unscrupulous, or is substantially injurious to consumers, competitors or other businesspersons.

96.     Defendants' aforementioned conduct caused substantial monetary injury to OC Global, which is a competitor or other businessperson, which could not reasonably have been

avoided and is not outweighed by any countervailing benefit to consumers, competitors or other businesspersons.

97.     As a direct and proximate result of Defendants' violations of CUTPA, OC Global has suffered ascertainable financial losses and damages.

98.     OC Global seeks actual damages in an amount to be determined at trial as permitted under Conn. Gen. Stat. § 42-110g(a).

99.     OC Global respectfully requests that, due to Defendants' deceptive, intentional, wanton and malicious acts, punitive damages in an amount to be determined at trial that takes into consideration Defendants' exponential growth and increase in enterprise value, be awarded to OC Global pursuant to Conn. Gen. Stat. § 42-110g(a).

100.    OC Global also respectfully requests that, due to Defendants' deceptive, intentional, wanton and malicious acts, court costs and reasonable attorneys' fees be awarded to OC Global pursuant to Conn. Gen. Stat. § 42-110g(d).

101.    Pursuant to Conn. Gen. Stat. § 42-110g(c), copies of this Complaint have been or will be mailed to the Attorney General and the Commissioner of Consumer Protection for the State of Connecticut.

### SIXTH CAUSE OF ACTION
Unjust Enrichment
(Against MOSS)

102.    OC Global re-alleges and incorporates paragraphs 1-52 as if fully set forth herein.

103.    MOSS received benefits from services rendered by OC Global including an amount equal to the OC Global Fee; profits derived from the sale of the MCO2 Tokens on the

Exchange; and increased value of the MOSS enterprise resulting from the Listing and the other services provided by OC Global.

104.    The benefits derived by MOSS came at the expense of OC Global, which expended significant resources in furtherance its services and the Listing.

105.    It would be unfair for the benefit to be retained by MOSS without any payment made to OC Global.

## SEVENTH CAUSE OF ACTION
Quantum Meruit
(Against All Defendants)

106.    OC Global re-alleges and incorporates paragraphs 1-52 as if fully set forth herein.

107.    OC Global rendered valuable services to MOSS, including introducing the Defendants to Gemini and promoting the MCO2 Tokens to Gemini.

108.    OC Global's services were rendered for the benefit of the Defendants.

109.    Defendants accepted, used and enjoyed services rendered by OC Global by taking meetings with Gemini which were facilitated by OC Global, listing the MCO2 Tokens on the Exchange, and deriving significant benefit from the Listing and other services.

110.    Defendants were aware that OC Global, in performing the services, expected to be paid as set forth in the Contract.

## EIGHTH CAUSE OF ACTION
Several Liability
(Against Mr. Adaime)

111.    OC Global re-alleges and incorporates each of the foregoing paragraphs as if fully set forth herein.

112.    As founder, Chief Executive Officer, and active partner of MOSS, a joint stock corporation, Mr. Adaime is severally responsible, on an unlimited basis, for all liabilities of MOSS as determined by this Court.

### NINTH CAUSE OF ACTION
Tortious Interference with a Business Expectancy
(Against Mr. Adaime)

113.    Plaintiff re-alleges and incorporates paragraphs 1-52 as if fully set forth herein.

114.    Plaintiff maintained a business relationship with Gemini.

115.    Mr. Adaime knew of Plaintiff's relationship with Gemini and knowingly and intentionally falsely represented that MOSS would pay to OC Global the OC Global Fee upon the successful Listing despite knowingly intending to prevent MOSS from doing so.

116.    Mr. Adaime knowingly and intentionally falsely represented that the Listing would constitute performance under the Contract despite knowingly intending not to acknowledge OC Global's entitlement to the OC Global Fee upon the Listing.

117.    As a direct and proximate result of Mr. Adaime's interference in OC Global's relationship with Gemini, OC Global has suffered actual damages in the form of reputational harm and loss of business opportunities both present and future, in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, OC Global prays for judgment and relief as follows:

A.  That this Court enter judgment in favor of OC Global and against Defendants on all counts alleged herein;

B.  That this Court grant monetary relief in the form of:

    i. Compensatory damages for all injuries to OC Global caused by Defendants' acts alleged herein;

    ii. An accounting of Defendants' profits and other economic benefits derived from Defendant's acts alleged herein;

    iii. Punitive damages under Connecticut General Statutes § 42-110b(a) and for Defendants' fraudulent acts and/or omissions; and

    iv. Attorneys' fees and costs; and

C. That this Court grant such other and further relief as it deems just and proper.

## JURY TRIAL DEMAND

OC Global respectfully demands a jury trial on all claims and issues so triable.

DATED:      December  14 , 2021

                          **Attorneys for Plaintiff**

                          By: _____

                          Joseph M. Pastore III (JP1717)
                          Melissa Rose McClammy (MM 7258)
                          Pastore LLC
                          420 Lexington Avenue, 3rd Floor
                          New York, NY 10170
                          845-667-5711 (Tel.)
                          646-661-4322 (Fax)
                          jpastore@pastore.net
                          mmcclammy@pastore.net

# EXHIBIT A

## PARTNERSHIP TERM SHEET

1. **LIRDES S.A**, joint-stock company, registered in the Single Tax Registry (RUT) under n.218648730013, with head office at 2141 Paraguay Street, 1502 workshop, in the city of Montevideo, Uruguay, herein represented in the form of its bylaws by its legal representative LUIS FELIPE ADAIME, Brazilian, divorced, businessman, passport holder number FO981942, resident and domiciled at Rota 10, Bairro Privado Laguna Blanca, Padrón 05, Manzana M, in the city of Punta del Leste, Uruguay, hereinafter referred to as "LIRDES"; and

2. **OC Global Partners, LLC** having its offices at 277 Cognewaugh Road Cos Cob, CT 06807), represented by its legal representative Shahryar Ovelssi hereinafter referred to as "[Shahryar]".

The objective of this document is to register the understandings between LIRDES and SHAHRYAR regarding the sales of LIRDES' environmental assets, which may be carried out as a result of the identification of buyers and assistance in negotiation by SHAHRYAR.

| 1. | Commercial presentation | • SHAHRYAR commits to identify and present to LIRDES potential buyers of environmental assets (carbon credits). <br> • SHAHRYAR will seek interested buyers focused on the compensation of greenhouse gas emissions, mainly for sales to legal entities (B2B). <br> There will be no obligation to devote fixed hours directed to these services. The commercial presentation can be done without a fixed commitment of time and agenda. It will be at SHAHRYAR discretion the time and energy it will make available to perform its activities. |
|----|----|----|
| 2. | LIRDES Support | • LIRDES recognizes and authorizes SHAHRYAR to seek new means to sell carbon credits. <br> • LIRDES and SHAHRYAR will work together and in good faith to develop a means by which future holders of carbon credits can offset or invest in the moss.earth platform. |
| 3. | Remuneration | • LIRDES undertakes to pay the amount corresponding to 25% of the total value resulting from the sales of its environmental assets (Carbon Credits or MCO2 tokens) to the buyers identified and presented by SHAHRYAR. <br> • The remuneration of determined in the agreement will be paid in carbon credits in the personal account on behalf of SHAHRYAR in the moss.earth platform. <br> • The remuneration obligation to Shahryar will survive the event of a termination of this agreement. Shahryar will continue to receive remuneration for as long as the buyer continues to transact with Moss. <br> • In case of carbon credits sales with large negotiated volumes, the discounts in the asset price can be discussed on a case by case basis. <br> • It should be noted that all purchases made with discounts will suffer lock ups of sale according to the |

| | | |
|---|---|---|
| | | discount granted. The commission referring to these discount sales will also be discussed on a case-by-case basis.<br>• For a Nespresso or Amazon land REIT deal, Moss will share the fees on a 70% Moss- 30% OC Global Partners, LLC |
| 4. | Exclusion of remuneration | The remuneration referred to in topic 3 will not be due, in case of transactions with clients who are already linked to another LIRDES partner or have already been approached directly by LIRDES. Moss will provide Shahryar with confirmation of this conflict via written communication, otherwise it will be assumed there was no conflict prior to introduction by Shahryar |
| 5. | Brand and consent for use of names | Any public use of the other party's name or brands, including any variation or theme, public statements, or media release, must be approved by the other party in advance. |
| 6. | Intellectual Property | LIRDES and SHAHRYAR, acknowledge and agree that all intellectual property rights remain the property of their respective owners. |
| 7. | Confidentiality | SHAHRYAR commits and undertakes to use the information of LIRDES, exclusively for the purposes of this term, always keeping the strict secrecy about such information.<br>SHAHRYAR also undertakes not to take any measures to obtain, for itself or for third parties, the intellectual property rights related to confidential information that may be revealed.<br>Confidential information shall have a period of up to five (5) years from the date of disclosure. |
| 8. | Sanctions | The breach of clause number 7, if duly proved, the LIRDES, will be subject, by action or omission, to the payment of all losses and damages suffered by LIRDES, including those of moral or competitive order, as well as those of civil and criminal liabilities, which will be ascertained in regular judicial or administrative proceedings. |
| 9. | Duration of the Agreement | This agreement is valid for a period of 12 months from the date of its signature. All remuneration due to SHAHRYAR shall be valid only for transactions concluded within the term of this instrument.<br>The Parties may extend this term by mutual agreement in writing. |

And, since they are fair and contracted, they sign this instrument, in two (2) counterparts of equal content.

São Paulo, 10th February 2021.

| | |
|---|---|
| DocuSigned by:<br>*Luis Adaime*<br>—F0BABA9283EF4D0…<br>**LIRDES S.A represented by Luis Felipe Adaime** | DocuSigned by:<br>[signature]<br>—3E3ADF89DCDD4419…<br>**OC Global Partners, LLC represented by Shahryar Oveissi- Managing Partner** |